Filed 1/22/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re FRANK ELI HEARD on Habeas Corpus. | D063181 |
| | (Super. Ct. No. SCD193832) |

Original proceeding on a petition for writ of habeas corpus. Relief granted.

Law Offices of Kurt David Hermansen, under appointment by the Court of Appeal, for Petitioner.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Randall D. Einhorn, Deputy Attorneys General, for Respondent.

A jury convicted Frank Eli Heard of two counts of attempted willful, deliberate and premeditated murder. (Pen. Code,[1] § 664, 187, subd. (a).) The jury found true that Heard committed the offenses for the benefit of a street gang. (§ 186.22, subd. (b)(1).) The jury also found true certain firearm use enhancements under section 12022.53,

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

subdivisions (c) and (d) and section 12022.5. Heard subsequently pled guilty to voluntary manslaughter (§ 192, subd. (a)) based on a shooting unrelated to the counts for attempted murder. He also admitted that he committed that offense for the benefit of a street gang (§ 186.22, subd. (b)(1)) and discharged a firearm causing great bodily injury and death within the meaning of section 12022.5, subdivision (a).

The superior court sentenced Heard to prison for a determinate term of 23 years for the manslaughter count and a consecutive indeterminate term of 80 years to life for the two counts of attempted murder. Heard was 15 years old when he committed the two counts of attempted murder and 16 years old when he committed the voluntary manslaughter.

Heard brings this petition for writ of habeas corpus, contending that his sentence is equivalent to a sentence of life without the possibility of parole, and thus, violates the holding of *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*). In *Caballero*, our high court "conclude[d] that sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*Id*. at p. 268.)

The Attorney General does not dispute that Heard's sentence is the equivalent to life without the possibility of parole, but counters that *Caballero*, *supra*, 55 Cal.4th 262 only applies to nonhomicide crimes and because Heard pled guilty to voluntary manslaughter, *Caballero* is distinguishable from the instant matter. As such, the Attorney General asserts Heard's sentence does not violate the Eighth Amendment, citing

2

the United States Supreme Court's recent case *Miller v. Alabama* (2012) 567 U.S. ___, 132 S.Ct. 2455, 2464, 2469 (*Miller*) (concluding "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment[,]" but noting a life-without-parole sentence is permissible for homicide offenses (although "uncommon") in the sentencing court's discretion).

The Attorney General is correct that Heard was sentenced, in part, for committing a homicide. Our high court in *Caballero*, *supra*, 55 Cal.4th 262 did not address such a situation. Instead, it left *Miller*, *supra*, 132 S.Ct. 2455 to be applied in the homicide context. (*Caballero*, *supra*, at p. 268, fn. 4.) Yet, this case does not present the same issue as the one addressed in *Miller*, *supra*, 132 S.Ct. 2455, namely the unconstitutionality of a mandatory life without the possibility of parole sentence for a homicide offense. Here, Heard did not receive such a sentence, and the portion of his sentence attributable to his homicide crime is 23 years, hardly the "harshest possible penalty" that concerned the Supreme Court in *Miller*. (See *id.* at p. 2469.)

Despite this matter not falling directly under the ambit of either *Miller*, *supra*, 132 S.Ct. 2455 or *Caballero*, *supra*, 55 Cal.4th 262, we remain concerned by Heard's sentence. Ironically, it is not the homicide that leads to the troubling nature of Heard's sentence, but the nonhomicide offenses, which account for the majority of Heard's prison term. When added to the determinate sentence Heard received for voluntary manslaughter, the 80-year-to-life indeterminate sentence for the nonhomicide offenses results in a de facto life without the possibility of parole sentence. Also, the homicide offense occurred six months after Heard's two attempted murder offenses. Additionally,

3

Heard's homicide offense was for voluntary manslaughter, a crime the Legislature has not seen fit to punish with a life sentence. Under these unique circumstances, we follow *Caballero*, *supra*, 55 Cal.4th 262 and conclude Heard's sentence violates the Eighth Amendment.

However, recently the Legislature enacted Senate Bill No. 260 (SB 260), which amends the California Penal Code to address the sentencing concerns expressed in *Miller*, *supra,* 132 S.Ct. 2455, *Caballero, supra,* 55 Cal.4th 262, and *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*). SB 260, which took effect January 1, 2014, provides almost every juvenile offender an "opportunity parole hearing" whereby the juvenile would be given a "meaningful opportunity" for release during his or her lifetime. The Attorney General maintains that this new law essentially moots Heard's petition because he will have the opportunity to be released during his lifetime. Despite SB 260 offering the possibility of release during Heard's lifetime, we nevertheless conclude a sentencing court must comply with *Graham*, *Miller*, and *Cabarello* in sentencing juvenile offenders. Accordingly, we grant the requested relief.

FACTUAL AND PROCEDURAL BACKGROUND

Heard was charged in an amended indictment with two counts of attempted murder and a third count of murder. The two attempted murders occurred about six months before the homicide. The amended indictment further alleged certain enhancements related to each count, including that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd.(b)(1)) and a variety of firearm use enhancements (§ 12022.53, subds. (c), (d) & (e)(1)).

4

The attempted murder charges stemmed from Heard's participation in a drive-by criminal gang style shooting in which two victims, alleged rival gang members, were injured.[2] The murder charge allegedly involved Heard shooting a minor whom he thought was selling drugs in Heard's criminal street gang's territory.[3]

The trial court granted Heard's motion to sever counts 1 and 2 from count 3. Counts 1 and 2 proceeded to a jury trial. At that trial, the jury found Heard guilty of both counts of attempted murder. The jury also found true the firearm allegations as well as the gang allegations.

After the verdict, Heard entered into a plea agreement on count 3. He pled guilty to the lesser included offense of voluntary manslaughter and admitted to committing the offense for the benefit of a criminal street gang under section 186.22, subdivision (b)(1) and personally using a firearm under section 12022.5, subdivision (a).

Prior to Heard's sentencing hearing, Heard's counsel filed a sentencing memorandum arguing it would be cruel and unusual punishment in violation of the Eighth Amendment to impose a life sentence on Heard. In the memorandum, Heard urged the court to consider Heard's age, family situation, exposure to violence at an early age, limited intelligence, and introduction to criminal street gangs as a toddler.

---

[2] A detailed summary of the facts of Heard's two counts of attempted murder are contained in *People v. Heard* (Feb. 24, 2009, D052492) [nonpub. opn.]), review denied May 20, 2009, S171378. The extent of the victims' injuries is not described in that opinion or in the record before us.

[3] We take the description of the homicide leading to the murder charge from Heard's probation report. This offense, however, was never tried.

During the sentencing hearing, Heard's attorney continued to advance a constitutional argument that the court should not sentence Heard to life in prison. The court was not convinced, commenting: "Clearly, objectively there's no constitutional infirmity for the imposing of a life sentence for an attempted premeditated murder. That is the desire of the Legislature. It has been confirmed by the court."[4] The court proceeded to explain that the issue that it must determine in sentencing Heard, was whether a "subjective analysis" "of Mr. Heard personally renders such a sentence constitutional[ly] infirm."

The court explained that Heard was the "poster child for the legislative intervention with regard to gangs." Considering the Legislature's focus on gang violence and the statutes enacted to address it, the court found "no constitutional infirmity in the application of either a life sentence as to the counts or a life sentence as to the enchancements." Accordingly, the court sentenced Heard to prison for a total of 80 years to life plus 23 years comprised of the following: 15 years to life for count 1 (attempted murder), 25 years to life for the firearm enhancement under section 12022.53, subdivision (d) on count 1; 15 years to life for count 2 (attempted murder), 25 years to life for the firearm enhancement under section 12022.53, subdivision (d) on count 2; and 23 years for count 3 (voluntary manslaughter). The court stayed additional 20-year enhancements under section 12022.53, subdivision (c) and section 12022.5 for counts 1 and 2. The court elected to run the sentences for counts 1, 2, and 3 consecutively.

---

4       Heard was sentenced prior to *Caballero*, *supra*, 55 Cal.4th 262 and *Miller*, *supra*, 132 S.Ct. 2455.

Heard appealed his conviction and sentence, and this court affirmed the judgment in *People v. Heard* (Feb. 24, 2009, D052492) [nonpub. opn.], review denied May 20, 2009, S171378. Heard filed a petition for a writ of habeas corpus with the superior court, claiming, among other things, his prison sentence is excessive because he will not be eligible for parole during his lifetime. The superior court denied the petition.

Heard then filed a petition for a writ of habeas corpus with this court, raising again the argument that his sentence was excessive. We requested an informal response to the petition from the Attorney General. After the Attorney General filed an informal response, Heard filed a reply. After considering the papers, we issued an order to show cause why relief should not be granted.

Counsel was appointed for Heard, and Heard filed a supplemental petition for a writ of habeas corpus. The attorney general filed a return, to which Heard filed a traverse. Shortly before oral arguments were scheduled in this matter, the Attorney General, by way of letter with an attached supplemental return, requested permission to file a supplemental return based on the Legislature's passage of SB 260. The Attorney General argued that SB 260 addressed Heard's concerns in his petition, and thus, this court should discharge the order to show cause.

We granted the Attorney General's request and filed the supplemental return. After doing so, we requested Heard file a response to the supplemental return, and we vacated oral argument in this case, which was to be rescheduled at a future date.

Heard filed his response to the supplemental return, and we recalendered oral argument in this matter.

7

DISCUSSION

The instant matter presents two issues for our consideration. The first is whether Heard's sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.[5] If we determine Heard's sentence violates the Eighth Amendment, we next must consider whether SB 260 cures the constitutional violation.

I

*HEARD'S SENTENCE AND THE EIGHTH AMENDMENT*

Over the past several years, the United States Supreme Court has addressed the constitutional limits of punishment for a juvenile's criminal offenses. In *Roper v. Simmons* (2005) 543 U.S. 551, the United States Supreme Court held the imposition of capital punishment on juvenile offenders for any offense whatsoever violated the Eighth Amendment. (*Id*. at pp. 578-579.) The court explained that because juveniles have lessened culpability they are less deserving of the most severe punishments. (*Id*. at p. 569.) The court noted that, as compared to adults, juveniles have a " 'lack of maturity and an underdeveloped sense of responsibility' "; they "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure"; and their characters are "not as well formed." (*Id*. at pp. 569-570.)

In *Graham*, *supra*, 560 U.S. 48, the United States Supreme Court continued to limit the scope of punishment applicable to juvenile offenders. Applying much of the

---

[5]    The Eighth Amendment applies to the states. (*Robinson v. California* (1962) 370 U.S. 660, 666-667.)

reasoning it found persuasive in *Roper*, *supra*, 543 U.S. 551, the court held that the Eighth Amendment prohibits states from sentencing a juvenile convicted of nonhomicide offenses to life imprisonment without the possibility of parole (LWOP). (*Graham*, *supra*, at p. 75.) In *Graham*, the 16-year-old defendant, Terrance Graham, committed armed burglary and attempted armed robbery, was sentenced to probation, and subsequently violated the terms of his probation when he committed other crimes. (*Id*. at p. 56-57.) The trial court revoked his probation and sentenced him to life in prison for the burglary. (*Id*. at p. 57.) Graham's sentence amounted to an LWOP because Florida had abolished its parole system, leaving Graham with no possibility of release unless he was granted executive clemency. (*Ibid*.)

The Supreme Court stated that nonhomicide crimes differ from homicide crimes in a "moral sense" and that a juvenile nonhomicide offender has a "twice diminished moral culpability" as opposed to an adult convicted of murder--both because of his crime and because of his undeveloped moral sense. (*Graham*, *supra*, 560 U.S. at p. 69.) The court relied on studies showing that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. [Citations.] Juveniles [also] are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." (*Id*. at p. 68, quoting *Roper*, *supra*, 543 U.S. at p. 570.) No legitimate penological interest, the court concluded, justifies an LWOP sentence for juvenile nonhomicide offenders. (*Graham, supra,* at pp. 74-75.)

9

Most recently, the Supreme Court applied the holding of *Graham*, *supra*, 560 U.S. 48 to homicide crimes, decreeing that the prohibition of cruel and unusual punishment set forth in the Eighth Amendment prohibits the imposition of a mandatory LWOP sentence on a juvenile offender. (*Miller, supra,* 132 S.Ct. at p. 2469.) Citing *Roper*, *supra*, 543 U.S. 551 and *Graham*, the court explained that in homicide cases involving juvenile offenders, the sentencing court is required "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, at p. 2469, fn. omitted.) The court elaborated:

> "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features-- among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him--and from which he cannot usually extricate himself--no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth--for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." (*Id*. at p. 2468.)

However, the Supreme Court in *Miller*, *supra*, 132 S.Ct. 2455, made clear that, in homicide cases, it was "not foreclos[ing]" the ability of a sentencing court to impose "this harshest possible penalty" of LWOP on " 'the rare juvenile offender whose crime reflects irreparable corruption.' " (*Id*. at p. 2469, quoting *Roper*, *supra*, 543 U.S. at p. 573.)

10

With the guidance of *Roper, supra,* 543 U.S. 551, *Graham, supra,* 560 U.S. 48, and *Miller, supra,* 132 S.Ct. 2455, the California Supreme Court recently determined "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment." (*Caballero*, *supra*, 55 Cal.4th at p. 268.) The court in *Caballero* reasoned: "*Miller* . . . made it clear that *Graham*'s 'flat ban' on life without parole sentences applies to all nonhomicide cases involving juvenile offenders, including the term-of-years sentence that amounts to the functional equivalent of a life without parole sentence imposed in this case. [¶] Defendant in the present matter will become parole eligible over 100 years from now. [Citation.] Consequently, he would have no opportunity to 'demonstrate growth and maturity' to try to secure his release, in contravention of *Graham*'s dictate. [Citations.] *Graham*'s analysis does not focus on the precise sentence meted out. Instead . . . it holds that a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime. [Citation.]" (*Id*. at pp. 267-268, fn. omitted.)

In reaching these conclusions, our high court in *Caballero* noted *Miller, supra,* 132 S.Ct. 2455 had "extended *Graham*'s reasoning (but not its categorical ban) to homicide cases . . . ." (*Caballero*, *supra*, 55 Cal.4th at p. 267.) The court pointed out *Miller* "also observed that 'none of what [*Graham*] said about children--about their distinctive (and transitory) mental traits and environmental vulnerabilities--is crime-specific. Those features are evident in the same way, and to the same degree, when . . . a

11

botched robbery turns into a killing. So *Graham's* reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses.' [Citation.]" (*Caballero, supra,* at p. 267.)[6]

These cases provide clear rules for the sentencing of juveniles. A juvenile cannot be sentenced to capital punishment for any crime. (*Roper*, *supra*, 543 U.S. at pp. 578-579.) A sentencing court may not sentence a juvenile to prison for life without the possibility of parole for nonhomicide offenses. (*Graham*, *supra*, 560 U.S. at p. 75.) A sentence for a juvenile who committed a nonhomicide offense that consists of a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy is prohibited. (*Caballero*, *supra*, 55 Cal.4th at p. 268.) Mandatory life without parole sentences for juveniles, even those who commit homicide, are not permitted. (*Miller*, *supra*, 132 S.Ct. at p. 2464.) An LWOP sentence for juveniles who committed a homicide offense is allowable only if the court considers the " 'mitigating qualities of youth' " and limits "this harshest possible penalty" to those "rare juvenile offender[s] whose crime[s] reflect[] irreparable corruption." (*Id*. at pp. 2467, 2469.) The instant matter, however, does not neatly fit under any of these rules.

Heard contends, and the Attorney General does not refute, that his sentence amounts to LWOP. The parties' agreement in this matter ends there.

The Attorney General argues that *Graham*, *supra*, 560 U.S. 48 and *Caballero*, *supra*, 55 Cal.4th 262 are distinguishable because Heard committed a homicide. The

---

6     Like here, the nonhomicide offenses in *Caballero*, *supra*, 55 Cal.4th 262 were attempted murders involving the defendant shooting at rival gang members. (*Id*. at p. 65.)

Attorney General further contends Heard's sentence is constitutional under *Miller*, *supra*, 132 S.Ct. 2455. We agree that Heard's commission of a homicide (here, voluntary manslaughter) ostensibly distinguishes this matter from *Graham* and *Caballero*. Yet, we are not persuaded that *Miller* somehow renders Heard's sentence constitutional. Further, we are concerned that the majority of Heard's sentence was based on his nonhomicide offenses, which raises the specter of the unconstitutional sentences prohibited by *Graham* and *Caballero*.

*Miller*, *supra*, 132 S.Ct. 2455 concerned two 14-year-old offenders. The first, a juvenile in Arkansas, was convicted of capital felony murder and aggravated robbery. Arkansas law required the juvenile be sentenced to prison for life without the possibility of parole. (*Id*. at p. 2461.) The second, a juvenile in Alabama, was convicted of murder in the course of arson, which carried a mandatory minimum punishment of life without the possibility of parole. (*Id*. at p. 2463.) In contrast, here, Heard pled guilty to voluntary manslaughter and was sentenced to prison for 23 years, the bulk of which resulted from enhancements. California law did not require or even allow a mandatory life without the possibility of parole sentence for Heard's homicide offense.

In addition, Heard was sentenced well before *Miller*, *supra*, 132 S.Ct. 2455 was decided. The court in *Miller* determined a mandatory life without the possibility of parole sentence for a juvenile unconstitutional, among other reasons, because it did not allow the sentencing courts to consider the juvenile's: (1) age and its hallmark features-- among them, immaturity, impetuosity, and failure to appreciate the risks and consequences; and (2) family and home environment. (*Id*. at p. 2468.) The court in

13

*Miller* emphasized that the sentencing court must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id*. at p. 2469.) Here, it is unclear from the record to what extent, if any, the sentencing court considered these factors in determining Heard's sentence. Indeed, the court emphasized its lack of discretion during the sentencing hearing and focused on Heard's gang involvement in figuring Heard's sentence.

Also, the Attorney General's argument overlooks the fact that the lion's share of Heard's sentence (80 years to life) stems from two nonhomicide offenses unrelated to Heard's homicide offense. No such concern was present in *Miller*. For this reason as well, we are not persuaded that Heard's sentence is constitutional under *Miller*, *supra*, 132 S.Ct. 2455.

Yet, although we determine that Heard's sentence should not be analyzed under *Miller, supra,* 132 S.Ct. 2455, the question remains whether Heard's homicide offense negates the constitutional protections provided to Heard under *Graham*, *supra*, 560 U.S. 48 and *Caballero*, *supra*, 55 Cal.4th 262. Under the novel circumstances before us, we conclude that Heard's particular homicide offense does not take this case outside the safety of *Graham* and *Caballero*. Paradoxically, our conclusion to apply both *Graham* and *Caballero* here is buttressed by *Miller*, *supra*, 132 S.Ct. 2455.

In *Miller*, *supra*, 132 S.Ct. 2455, the Supreme Court stopped short of applying *Graham*'s categorical ban on LWOP sentences for juveniles. (*Id*. at p. 2469.) It did so because the juveniles there were convicted of homicide crimes. The court, however,

14

expressed its belief that very few juveniles, even those convicted of homicide offenses, would be sentenced to life without the possibility of parole:

> "But given all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller*, *supra*, at p. 2469.)

Thus, *Miller*, *supra*, 132 S.Ct. 2455 leaves open the possibility that a court could sentence a juvenile to life without the possibility of parole, but may only do so if it considers certain factors and the circumstances of the crime to determine the juvenile is that "rare . . . offender whose *crime* reflects irreparable corruption." (*Id*. at p. 2469, italics added.) However, the court made clear in *Graham*, *supra*, 560 U.S. 48 that a nonhomicide crime cannot serve as the basis for an LWOP sentence. Accordingly, under *Graham* and *Miller*, the justification for an LWOP sentence must come from the homicide crime itself. (See *Miller*, *supra*, at p. 2469; cf. *Graham*, *supra*, at p. 75.)

Here, Heard pleaded guilty to voluntary manslaughter. In California, voluntary manslaughter is punishable by imprisonment of three, six, or 11 years. (§ 193, subd. (a).) Heard also admitted to enhancements under sections 186.22, subdivision (b)(1)(C) and 12022.5, subdivision (a). These allowed for additional prison terms of 10 years and three, four, or 10 years respectively. Thus, at most, the court could have sentenced Heard

15

to prison for 31 years for the voluntary manslaughter offense. Instead, it sentenced Heard to 23 years, far short of the length of sentence that concerned the Supreme Court in *Miller*, *supra*, 132 S.Ct. 2455. Simply put, the homicide crime here could not have subjected Heard to an LWOP sentence, and Heard's sentence for voluntary manslaughter is not a sentence that implicates the constitutional protections of *Miller*. Put differently, considering the maximum sentence for the specific homicide crime, the offense of voluntary manslaughter cannot be a crime that reflects "irreparable corruption" as required by *Miller*. (See *id*. at p. 2469.)

Therefore, we are left with Heard's sentence for his nonhomicide crimes, which is 80 years to life. Having determined that Heard's homicide crime is not of the caliber that triggers *Miller*, *supra*, 132 S.Ct. 2455, we must evaluate this case under *Graham*, *supra*, 560 U.S. 48 and *Caballero*, *supra*, 55 Cal.4th 262. In light of this precedent, we determine that Heard's sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment. We do so, however, based on the unique circumstances before us.

Heard committed the attempted murders at age 15 and the voluntary manslaughter at age 16. The nonhomicide offenses and the homicide offense were unrelated, having occurred almost six months apart. Heard's homicide offense is voluntary manslaughter.[7] For that crime, including the enhancements that he admitted true, the sentencing court could have sentenced Heard to a total of 31 years, but sentenced him to 23 years instead.

---

[7]    The fact that Heard pled guilty to the voluntary manslaughter charge as part of a plea bargain does not impact our analysis.

16

The majority of Heard's sentence is attributable to his nonhomicide crimes, comprising two 40-year-to-life sentences. The court ordered Heard to serve those sentences consecutively after serving his 23-year sentence on the manslaughter offense. The presence of the specific homicide crime here is not the talisman that protects Heard's sentence from constitutional scrutiny. In other words, we do not believe the Constitution allows for the sentencing judge to ignore the holdings of *Graham*, *supra*, 560 U.S. 48 and *Caballero*, *supra*, 55 Cal.4th 262 because of a homicide that carries a maximum sentence far short of life without the possibility of parole. Under these distinctive facts, we determine that Heard's sentence violates the Eighth Amendment.

II

*SB 260*

Having determined that Heard's sentence violates the Eighth Amendment, we next consider whether SB 260 negates the need to remand this matter back to the trial court for resentencing. Section 1 of SB 260 states in relevant part: "The Legislature finds and declares that, as stated by the United States Supreme Court in *Miller v. Alabama* (2012) 183 L.Ed.2d 407, 'only a relatively small proportion of adolescents' who engage in illegal activity 'develop entrenched patterns of problem behavior,' and that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds,' including 'parts of the brain involved in behavior control.' The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society. The

17

purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in *People v. Caballero* (2012) 55 Cal.4th 262 and the decisions of the United States Supreme Court in *Graham v. Florida* (2010) 560 U.S. 48, and *Miller v. Alabama* (2012) 183 L.Ed.2d 407."[8]  (Legis. Counsel's Dig., SB 260 (2013-2014 Reg. Sess.) § 1, pp. 2-3.)

New section 3051, subdivision (a)(1), provides that "any prisoner who was under 18 years of age at the time of his or her controlling offense" shall be afforded a "youth offender parole hearing."  Juvenile offenders with determinate sentences of any length shall receive a hearing during the 15th year of incarceration.  (New § 3051, subd. (b)(l).)  Juvenile offenders sentenced to life terms of less than 25 years to life shall receive a hearing during the 20th year of incarceration.  (New § 3051, subd. (b)(2).)  Juveniles sentenced to an indeterminate base term of 25 years to life will receive a hearing during the 25th year of incarceration.  (New § 3051, subd. (b)(3).)  The youth offender parole hearing "shall provide for a meaningful opportunity to obtain release."  (New § 3051, subd. (e).)  Any psychological evaluations and risk assessments used by the Board of Parole Hearings "shall be administered by licensed psychologists employed by the board

---

[8]    SB 260 exempts from its provisions "inmates who were sentenced pursuant to the Three Strikes law or Jessica's Law, or sentenced to life in prison without the possibility of parole."  SB 260 also is not applicable to "an individual to whom the bill would otherwise apply, but who, subsequent to attaining 18 years of age, commits an additional crime for which malice aforethought is a necessary element of the crime or for which the individual is sentenced to life in prison."  (Legis. Counsel's Dig., SB 260 (2013–2014 Reg. Sess.) p. 2.)

18

and shall take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual."  (New § 3051, subd. (f)(1).)

The Attorney General maintains that SB 260 provides Heard with the possibility of parole within his life expectancy; therefore, the new law addresses "the specific concern expressed in *Caballero*[,]" *supra*, 55 Cal.4th 262.  Consequently, the Attorney General argues the purpose of Heard's petition has been achieved, and we should discharge the order to show cause.

In response, Heard contends:  (1) he is not guaranteed to receive an opportunity to avail himself of SB 260; (2) even if SB 260 remains in effect, he will not receive the benefit of SB 260's two entitlements; (3) SB 260, as applied to Heard, violates his Fourteenth Amendment right to equal protection; and (4) SB 260's passage does not remedy the sentencing court's failure to consider the mitigating circumstances of Heard's youth, as required by *Miller*, *supra*, 132 S.Ct. 2455.  To resolve the issue before us, we focus on Heard's first and fourth contentions.

We are not the first court to address the effect of SB 260 on a juvenile's prison sentence.  In *In re Alatriste* (2013) 220 Cal.App.4th 1232 (*Alatriste*),[9] the court

---

[9]     A petition for review was filed on December 3, 2013, in *Alatriste*, *supra*, 220 Cal.App.4th 1232, but our high court has not yet acted on the petition.  In addition, recently, another Court of Appeal cited with approval *Alatriste* in reaching the same conclusion that SB 260 rendered an LWOP sentence constitutional because SB "260 . . . insures that [petitioner] will be afforded a meaningful opportunity for release on parole after a set number of years based upon fixed criteria."  (*People v. Martin* (2013) 222 Cal.App.4th 98, 105.)  As we discuss below, we disagree with the holdings of both *Alatriste* and *Martin*.

19

determined that the two petitioners' sentences for homicide (77 years to life and 50 years to life) did not violate the Eighth Amendment because SB 260 provides both petitioners with a meaningful opportunity to obtain release on parole during their respective lifetimes. (*Alatriste*, *supra*, at pp. 1239-1240.) In reaching this conclusion, the court noted the difficulties experienced by trial courts in attempting to follow *Graham*, *supra,* 560 U.S. 48, *Miller, supra,* 132 S.Ct. 2455, and *Caballero, supra,* 55 Cal.4th 262:

> "The Legislature has enacted statutes designed to ensure lengthy prison sentences for defendants who commit serious and/or violent felonies. These sentencing statutes, particularly those requiring trial courts to impose certain sentence enhancements, limit a trial court's sentencing options. When sentencing a juvenile defendant, a trial court, while accommodating this statutory framework, must consider objective factors such as the defendant's age, level of participation in the crime and, to a certain extent, life experiences. However, the court must also evaluate subjective factors, such as the defendant's 'physical and mental development,' [citation] in order to determine when the defendant might attain a sufficient level of maturity to warrant release on parole. The court must then fashion a sentence that gives the defendant a meaningful opportunity for release on parole during his or her lifetime, and must utilize actuarial skills to determine how long the defendant's lifetime might be." (*Alatriste*, *supra*, 220 Cal.App.4th at p. 1238.)

The court emphasized that SB 260 was a direct response to *Graham, supra,* 560 U.S. 48*, Miller, supra,* 132 S.Ct. 2455 and *Caballero, supra,* 55 Cal.4th 262 in that it ensures prisoners, who "were juveniles at the time they committed their life crimes, will have the benefit of the type of evaluation compelled by *Miller, Graham* and *Caballero* at a point in time that gives them a meaningful opportunity to 'obtain release based on demonstrated maturity and rehabilitation.' [Citation.]" (*Alatriste*, *supra*, 220 Cal.App.4th at pp. 1239-1240.) In other words, SB 260 allows trial courts to avoid the type of

20

evaluation of a juvenile defendant at the time of sentencing that is mandated by *Graham*, *Miller*, and *Caballero* because the Board of Parole Hearings will engage in the required assessment at a later time. In reaching this conclusion, the court emphasized that *Graham*, *Miller*, and *Caballero* only hold that a juvenile may not be incarcerated for life or its functional equivalent without some meaningful opportunity for release on parole during his or her lifetime, but "[t]hese cases do not require that the time when that meaningful opportunity might occur should be determined at the time of sentencing." (*Alatriste*, *supra*, at p. 1240.)

We respectfully disagree with the court's conclusion in *Alatriste*, *supra*, 220 Cal.App.4th 1232. Although SB 260 offers almost all[10] juvenile offenders a "meaningful opportunity" to obtain parole during their lifetimes, we do not share the court's determination in *Alatriste* that SB 260 essentially allows a sentencing court to ignore the requirements of *Graham*, *Miller*, and *Caballero*. These three cases focus on the differences between adult offenders and juvenile offenders. (See *Graham*, *supra*, 560 U.S. at pp. 67-69; *Miller*, *supra*, 132 S.Ct. at p. 2469; *Caballero*, *supra*, 55 Cal.4th. at p. 267.) They stress the importance of the sentencing court considering these differences when sentencing the juvenile offender. The holding of *Alatriste*, *supra*, 220 Cal.App.4th 1232 allows the sentencing court to disregard *Graham*, *Miller*, and *Caballero* because of the impact of SB 260 on a juvenile's sentence. In other words, *Alatriste* relieves the sentencing court of its constitutional duty to consider the differences between juveniles and adults when sentencing juvenile offenders because SB 260 is intended to provide a

10      See footnote 8.

21

juvenile offender a "meaningful opportunity" to obtain release on parole during his or her lifetime.

We do not read SB 260 as a replacement of the sentencing court's execution of its constitutional duties as required under *Graham, supra,* 560 U.S. 48*, Miller, supra,* 132 S.Ct. 2455 and *Caballero, supra,* 55 Cal.4th 262 to consider the differences between juveniles and adults when sentencing a juvenile offender. Instead, we view SB 260 as a "safety net" to guarantee a juvenile offender the opportunity for a parole hearing during his or her lifetime. As a result, we conclude the sentencing court still must attempt to prescribe the constitutionally appropriate sentence under *Graham*, *Miller*, and *Caballero*.[11]

SB 260 does not allay a sentencing court's duty to impose the appropriate sentence for a juvenile offender. This is no easy task. (See *Alatriste*, *supra*, 220 Cal.App.4th at p. 1238 [noting "the directives of *Graham*, *Miller*, and *Caballero* have proved challenging for trial courts."].) However, a sentencing court may not forgo its responsibility simply because its charge under *Graham, supra,* 560 U.S. 48*, Miller, supra,* 132 S.Ct. 2455 and *Caballero, supra,* 55 Cal.4th 262 may prove to be arduous.

This is all the more true because there is no guarantee that SB 260 will remain in existence when Heard would be eligible to benefit from it. We are troubled by the

---

[11] During oral argument, the Attorney General agreed on this point, conceding that, even with the passage of SB 260, the sentencing court must consider the factors discussed in *Graham, supra,* 560 U.S. 48*, Miller, supra,* 132 S.Ct. 2455 and *Caballero, supra,* 55 Cal.4th 262. Because on the record before us we cannot determine whether the sentencing court considered the relevant factors, SB 260 could not transform Heard's sentence here from unconstitutional to constitutional.

potential consequences if California trial courts begin to ignore the requirements of *Graham, supra,* 560 U.S. 48, *Miller, supra,* 132 S.Ct. 2455 and *Caballero, supra,* 55 Cal.4th 262 in sentencing juvenile offenders only to have SB 260 replaced or repealed at a later date. The prudent course remains for a sentencing court to abide by the constitutional requirements of those cases in sentencing juvenile offenders.

Even with the passage of SB 260, a sentencing court nonetheless remains obligated to follow *Graham, supra,* 560 U.S. 48, *Miller, supra,* 132 S.Ct. 2455 and *Caballero, supra,* 55 Cal.4th 262 when sentencing a juvenile offender. To this end, a sentencing court must consider, at the very least, the differences between an adult and a juvenile and how those differences should impact the sentence given to the juvenile offender as required by *Graham*, *Miller*, and *Caballero*. SB 260 can help avoid some of the inconsistencies in sentencing juveniles noted by the court in *Alatriste*, *supra*, 220 Cal.App.4th 1232 as well as provide some reassurance to the sentencing court that the juvenile, except in the rarest of circumstances,[12] will receive a "meaningful opportunity" to be released on parole during his or her lifetime.

Heard's sentence of 23 years and 80 years to life is reversed and the matter remanded for resentencing consistent with this opinion. We express no opinion as to what sentence should be imposed.

Because we decide this issue based on only two of Heard's arguments (SB 260 does not relieve the sentencing court from considering the mitigating circumstances of Heard's youth and SB 260 may not be in existence at the time Heard would benefit from

---

[12]    See footnote 8.

it), we do not reach Heard's additional arguments raising constitutional challenges to the application of SB 260 to his sentence.

## DISPOSITION

We grant the requested relief.  Heard's sentence of 23 years and 80 years to life is reversed and the matter remanded for resentencing consistent with this opinion.


HUFFMAN, J.

WE CONCUR:


BENKE, Acting P. J.


HALLER, J.